# CASES

# SUPREME JUDICIAL COURT

# STATE OF MAINE.

---

JOHN WINCHESTER *versus* INHABITANTS OF CORINNA.

The defendant town, at a legal meeting held in August, 1864, voted, — "to raise $300, to each volunteer," and in addition "to pay such volunteer $16 per month," specifying the time of service essential to entitle the volunteer to such "bounty and pay, to be one year." In an action by one who volunteered upon the defendants' quota for one year and served until honorably discharged at the close of the rebellion; *Held,* —

1. That this vote was a promise to pay such volunteer the sums named;

2. That such volunteer was entitled to the full amount, although he served but nine months, he having been discharged by act of the government, before the year expired; and

3. That the vote was ratified and made valid by c. 298* of the Public Laws of 1865, notwithstanding that, when passed, it was expressly prohibited by c. 227* of the Public Laws of 1864.

The Legislature has power to confer the authority upon towns to offer or pay bounties, and to ratify votes offering bounties by subsequent enactment.

ON REPORT.

ASSUMPSIT to recover certain bounties.

It appeared that the defendant town, at a legal meeting held on August 24, 1864, under an article, — " To see what sum of money the town will raise to be expended in hiring men to fill the town's quota under the call of July, 1864," voted, " to raise three hundred dollars to each volunteer, to be paid when mustered into the United States service. In addition to this, the town pays each volunteer $16, per

---

* See opinion.

month, for each month in the service. The term of service specified to entitle the volunteer to the bounty and pay above mentioned, was one year."

The plaintiff proved that he, relying upon these votes, soon afterwards enlisted upon the town quota, under the call of July, 1864, and was duly accepted and mustered into the service of the United States, on September 17, 1864, and served in the 4th Maine Battery, to which he was duly assigned, during the final campaign around Richmond and Petersburg, in the fall of 1864, and winter and spring of 1865, and until the surrender of the rebel forces, and was duly and honorably discharged from the service of · the United States, under a general order of the War Department, at Washington, on June 17, 1865, thus serving a period of nine months.

He also proved that, by his agent duly authorized, he demanded, on November 26, 1864, of the selectmen of the town, payment of the $300 bounty, named in the foregoing vote. That they offered to give, and did make out and sign a town order for $200, which was refused by plaintiff's agent; but said agent offered to take an order for the $300. At the annual town meeting held in March, 1865, the selectmen made the · usual report of the outstanding debts of the town, which included, among other items, the monthly pay of the plaintiff and of other volunteers under the vote aforesaid, for the months served by each, down to that date. The report was duly accepted by the town. On June 26, 1865, the plaintiff having returned from the service, demanded in person, of the selectmen, the $300 bounty aforesaid and pay for nine months service, at $16 per month, being $144, making a total of $444. The selectmen offered to pay him $200 of the bounty and the $144 for the nine months service, making $344. The plaintiff refused to take that sum.

At the annual meeting in March, 1866, the selectmen made their usual report to the town of its outstanding debts,

including, among other items of indebtedness, $344, as due the plaintiff.

The defendants offered to prove that, before the above vote was passed, a written motion was made to raise $500 for each volunteer, including the State bounty, and that this motion was voted down; and that then the former vote as now appears of record was passed. The vote offered to be proved by the defendants did not appear of record. The case was then continued on report, with an agreement that, if the evidence offered by the defendants should be held admissible and material, the action to stand for trial; otherwise the full Court to dispose of it in accordance with the legal rights of the parties.

*D. D. Stewart*, for the plaintiff.

*J. A. Peters*, for the defendants.

1. No legal consideration for such a contract. The town has and had no power to tax its inhabitants for such purposes. It is beyond the powers of a town conferred by its incorporation.

2. It was an illegal contract. Towns were allowed to raise and pay nothing. It was expressly prohibited by c. 227, § 3, of laws of 1864. See also § 4.

3. The contract could not be ratified by the Legislature. It would not be a constitutional act. The Legislature can by an act cure informalities and technical defects in the slack performance of what a town could do. But cannot make valid what they were not only not authorized to do, but what was by law expressly prohibited. *Allen* v. *Archer*, 49 Maine, 346.

4. By an analysis of the whole proceedings, it is clearly evident that defendants voted no more than "the law will allow a town to raise for such purposes." In other words, they voted to pay $300 provided it was by law allowable. The vote "to raise all the money the law will allow a town to raise" must have some meaning in the text, and it means that no more than the law would allow could be raised.

The unrecorded motion voted down, to raise $500, including $300 of State, leaving $200 by town, showed that $300 was not intended merely to be an advance from the State. This they could advance.   See § 6, c. 227, of 1864, before cited.

Plaintiff not entitled to the monthly pay, nor the $300, because not in the service one year.   " The term of service," &c., &c., was one year.   Plaintiff got the State bounty besides.

The town made no contract with the plaintiff.   Passing a vote was one step ; next was to make a contract.   The vote could never become binding on the town until the town had ratified it, after the healing Act of the Legislature.   They not being bound, could not become so without some action on their part to make it so.

KENT, J.—The claim of the plaintiff depends for its validity upon the construction of the votes of the town and the constitutional power of the Legislature to ratify and make binding those votes.

Although by the record it appears that there was a diversity of opinion and a somewhat remarkable fluctuation and contrariety in the votes passed and reconsidered, yet the final vote, which must be regarded as superseding all the former proceedings, is plain and explicit.

The article in the warrant called upon the town to determine what sum of money it would raise to be expended in hiring men to fill up the town's quota under the call of July, 1864.   The town voted "to raise three hundred dollars to each volunteer, when mustered into the United States service, and in addition to this the town pays each volunteer sixteen dollars per month for each months service.   The term of service specified to entitle the volunteer to the bounty and pay above mentioned was one year."   This was an offer and a promise to pay to each such volunteer on the town's quota, the sums named.   The case finds that the plaintiff, after the passing of these votes, and " relying upon the strength of

the same," did enlist upon the town's quota required under the call of July, 1864,—was accepted and mustered into the service on an enlistment for one year, and served until the end of the rebellion, when he was honorably discharged. He served nine months only. But we are satisfied that the term of service, referred to in the vote, was the term for which he enlisted, and not the time of actual service, if he was discharged by act of the government, before the year had expired. The essential thing which the town was desirous to secure, was an enlistment which would fill the requirements of the call and relieve the town or its inhabitants from liability to draft. This was done by the plaintiff.

He complied with the offer of the town and would seem to be entitled to the sums claimed by him, unless the proceedings of the town and its votes are inoperative and void for want of legal authority to pass them. The town seems to have regarded the plaintiff's claim as valid, except for one hundred dollars, which it claimed to retain, because the State paid one hundred dollars as bounty. But we think that the town is not estopped by its acts from setting up in defence, the want of legal authority to act in the premises. We must therefore consider this point.

At the time these votes were passed, there was no legal power in this municipal corporation to pass them. It has been settled by a series of decisions, in this State and other States, that towns in their corporate capacity are not bound to furnish soldiers or material of war. It is no part of the duties or rights imposed upon them, by the nature of their powers, or the original purposes of their creation. The general doctrine is, that towns must be confined to the exercise of the powers and performance of the duties conferred by legislative acts. They have no inherent powers beyond those granted by such statutes. The authorities to sustain these propositions are so familiar and so often cited that it is unnecessary to name them.

At the time, when these votes were passed, the town, so

far from having any such power, was expressly prohibited by the Act of 1864, c. 227, from raising or paying any bounty in addition to the bounty of three hundred dollars offered by the State, and was only authorized to raise not exceeding twenty-five dollars for each man enlisted, to pay recruiting expenses. It is clear, therefore, that the votes of the town, at the time they were passed, transcended its powers and were illegal and could not be held as binding. But, by the Act of 1865, c. 298, these proceedings were made valid. The Act provides that "the *past* acts and doings of cities, towns and plantations, in offering, paying, agreeing to pay, and in raising and providing the means to pay bounties to  *  *  *  volunteers, drafted men or substitutes of drafted or enrolled men, who have been or shall hereafter be actually mustered into the military or naval service of the United States, are hereby made valid."

The defendants present two objections to the validity of the act in question. One is, that the Legislature could not constitutionally make valid the *prior* acts and votes of the town by a subsequent statute. The other is, that the Legislature had no power to authorize towns to pass such votes and pay such bounties, even if the statute had been enacted before the action of the town.

In relation to the first objection, we are satisfied that, if the Legislature could authorize the action by prior legislation, it could, in a case like this, give validity to the doings by subsequent ratification.

It is unnecessary for us to consider the exact limit of this power to ratify and make valid the proceedings of corporations or individuals by subsequent legislation. We cannot doubt that where, as in this case, the action of the town was in relation entirely to public matters, of high national concern, and did not in any way touch or affect vested rights or private interests, as distinct from public exigencies, the Legislature might ratify and make valid whatever it might constitutionally authorize before action.

The votes in question were in their nature of a political

character, and not personal or affecting individual rights of property. The whole current of authorities on the subject of subsequent ratification confirm this view of the binding force of such legislation. *Allen* v. *Archer*, 49 Maine, 346; *Simmons* v. *Hanover*, 23 Pick.; *Walter* v. *Bacon*, 8 Mass., 468; *Patterson* v. *Philbrook*, 9 Mass., 151; *Locke* v. *Dame*, 9 Mass., 360; *Denny* v. *Maltoon*, 2 Allen, 361. In the case last cited, some of the prior cases in Massachusetts are said not to be very satisfactory. But there is nothing in the opinion, which would render doubtful the exercise of the power in a case like this before us. The great objection in most of the cases is, that rights of individuals, in distinction from their citizenship or their relations to the whole community, are injuriously affected. No such objection exists in the case before us. But the second question is whether the Legislature had any right or power to confer the authority upon towns to offer or pay bounties?

When these votes were passed, the country was in the midst of a gigantic struggle for existence, against armed foes, and "those of its own household." It had then, for more than two years, been engaged, as a government, with armies in the field, in the determined purpose to save itself and the country, from the equally determined purpose of rebels and traitors to destroy both. Can any one question the right and duty of our general government to call into exercise the whole physical power of the country, and all its moral, financial resources?

In such form as it might decide to be expedient, it had the right to call every man capable of bearing arms into the field, and to demand the last dollar, if necessary, from the individual citizen. In its hour of imminent peril, it might require equally of the willing and the unwilling, of the loyal man and the sympathizer with treason, whatever any or all could furnish for its necessities, to the last man and the last dollar.

Undoubtedly it must do this under proper laws and orders, emanating from the proper sources. But it could de-

signate the individuals or class of men required for any purpose; could fix the age and qualification of those who were called as soldiers into the field, and the extent and mode of taxation or excise duties, to obtain money and means. It could call directly on the individual, or through the action of the States, or of any municipality or organization, which would assume to perform what was asked or required. It could avail itself of local divisions, the boundaries of States, counties, parishes or towns. In fact, the States were appealed to and notified of the number of men that would be required from its limits. The State being thus notified and its aid invoked, had it the power to act? It clearly had, unless there was some distinct prohibition in its own constitution. We know of no such prohibition or limitation in this matter in our State constitution. It would be strange if there should be any such found in that instrument. For, in this exigency, the nation and the loyal States were in common peril, assailed by a common foe, and were " in the same boat," attempting to preserve a common existence. The people of the States and the people of the United States were identical. The State itself, as well as its people, whose sovereignty the Legislature represented, had a deep stake in the issue, and in the maintenance of the union of all the States, in its entirety and vigor.

If it be granted, that the call was not an imperative one on the State, as on a province or vassal, by an absolute command to send to the field a stipulated number of men; or even such a call as was made on the States during the revolution, when we were under the old confederation, yet no one can doubt that the State might assume, if it saw fit, to aid by voluntary action, by offering bounties or additional pay, or in other modes. If there is any limitation of the power of the State in this respect, it must be found in the constitution. The whole legislative power, which was originally in the people, has been conferred on the Legislature, with such qualifications and restrictions only as are found in the constitution. We find none touching this question.

If, then, the State could do it, as the single act of the State, why may it not authorize any municipality or public organization to do the same thing? It is to be remembered that it is not a question of compulsory but of voluntary action. Now although, as we have seen, towns were never bound, as an act of municipal duty, to furnish men, yet the general government, by its own military officers, had seen fit to adopt town lines and to apportion the quotas by such limits, and to require that a certain number of men should be furnished from the citizens residing within the limits of the town. If the town, in its corporate capacity had no liabilities, its citizens had a distinct liability and duty to perform, limited and measured by the town lines. It was not merely a patriotic duty, but a certain and fixed liability to furnish the quota of men required by the United States. There was no escape from this. The demand was for men, actual, living, efficient men, and these men must be furnished from the able bodied men within the specified ages. It was but just and equitable, that those who were exempt and those who remained at home, should contribute to make the compensation of those who periled their lives in the field, something more than mere monthly pay. The question is whether it was beyond the power of the Legislature to clothe the town with the power to do this if it saw fit. We find nothing in the constitution which prohibits the Legislature from conferring this power, which it might itself exercise, (and did exercise, in fact, most liberally and patriotically,) on towns.

The votes passed by Corinna were within the power given or ratified. There was no want of equity or justice in the offer made. The votes were passed in aid of the government, and were patriotic and loyal in their nature and scope. They violated no law, after ratification, and no provision of the constitution. They were simply a convenient and effectual mode by which the inhabitants could do their duty and "give encouragement," not to the enemies, but to the

friends of their country.   We see no reason why the plaintiff is not entitled to recover.

We find our views are substantially the same, so far as the direct question of the power of the Legislature to authorize or render valid the doings of towns, as those of the courts in other States.   *Fowler'* v.   *Danvers,* 8 Allen, 82 ; *Booth* v.   *Town of Woodbury,* 32 Conn. ;   *Crowell* v.   *Hopkinton,* 45 N. H., 9.

The evidence offered by the defendant to qualify or affect the record is inadmissible.   The vote, as recorded, must govern, and this is a promise to pay $300, and says nothing about the State bounty.

*Judgment for plaintiff for* $444, *and interest from June* 26, 1865.

Appleton, C. J., Cutting, Walton, Dickerson and Tapley, JJ., concurred.